Youlu Zheng and DONALD J. HILLENMEYER on behalf of themselves and all others similarly situated, Plaintiffs,

against
Carl C. Icahn, CARL J. GRIVNER, ADAM DELL, FREDRIK GRADIN, VINCENT INTRIERI, KEITH MEISTER, ROBERT KNAUSS, DAVID S. SCHECTER, PETER SHEA, HAROLD FIRST, DANIEL A. NINIVAGGI, ACF INDUSTRIES HOLDING CORPORATION, ARNOS CORPORATION, HIGH RIVER LIMITED PARTNERSHIP, STARFIRE HOLDING CORPORATION, ARNOS SUB CORP., XO MERGER CORP., BARBERRY CORPORATION, and XO HOLDINGS, INC., Defendants.

R2 Investments, LDC, Plaintiff,
against
Carl C. Icahn, CARL J. GRIVNER, ADAM DELL, FREDRIK GRADIN, VINCENT INTRIERI, KEITH MEISTER, ROBERT KNAUSS, DAVID S. SCHECTER, PETER SHEA, HAROLD FIRST, DANIEL A. NINIVAGGI, ACF INDUSTRIES HOLDING CORPORATION, ARNOS CORPORATION, HIGH RIVER LIMITED PARTNERSHIP, STARFIRE HOLDING CORPORATION, ARNOS SUB CORP., XO MERGER CORP., BARBERRY CORPORATION, and XO HOLDINGS, INC., Defendants.

650499/10

For class plaintiffs: Judith L. Spanier, Esq. of Abbey Spanier, LLP 
For defendants Herbert Beigel, Esq., Law Offices of Herbert Biegel


Charles E. Ramos, J.

The above-captioned two consolidated actions, Index Nos. 650499/10 and 601296/09 ("Zheng" and "R2", respectively) were brought by common shareholders of defendant XO Holdings, Inc ("XO"), seeking relief arising out of the $780 million refinancing of XO's debt to defendant Carl C. Icahn ("Icahn"), negotiated by a special committee formed (the "2008 Special Committee") by XO's Board of Directors (the "XO Board"), in July 2008 (the "2008 Recapitalization") and out of a subsequent cash-out merger between defendant ACF Industries Holding, Inc. ("ACF"), a company controlled by Icahn, and XO, also negotiated by a special committee formed by XO's Board (the "2011 Special Committee", collectively with the "2008 Special Committee", the Special Committees), in August 2011 (the "2011 Merger", collectively with the "2008 Recapitalization", the "Challenged Transactions").
XO, a Delaware corporation, provided wireline telecommunications services. XO's stock traded "over the counter" (PX-10A). XO's common shares traded as high as $8.33 per share on July 9, 2003 and as low as $0.12 per share in 2008 (DX-3).
The plaintiffs allege that the 2008 Recapitalization unfairly diluted the plaintiff-common shareholders' interests. In regard to the 2011 Merger, the plaintiffs allege that the consideration of $1.40 per share was grossly inadequate because Mr. Icahn depressed XO's stock price and the 2011 Special Committee undervalued the Company's stock in negotiating the merger price.
The plaintiffs also claim that one of the material effects of the Challenged Transactions was to unfairly allow Icahn to obtain all of XO's net operating losses (the "NOLs"), conferring a benefit to Icahn worth hundreds of millions of dollars.
The defendants argue, as is their burden under the governing "entire fairness" doctrine, that the evidence has established that the Challenged Transactions were fair to the plaintiffs with respect to both the functioning of the Special Committees and the prices of the Challenged Transactions. The defendants further argue that the plaintiffs, as a matter of law, are not entitled to any of the benefits received by Icahn by virtue of his being able to use XO's NOLs post-Merger.
Procedural History
This Court previously rejected the plaintiffs' claim that the members of XO's Special Committees were not independent, and held that Delaware's "entire fairness" doctrine applies to both of the Challenged Transactions. The entire fairness doctrine requires, inter alia, that this Court to determine whether the Special Committees were "well-functioning" and whether the prices of the Challenged Transactions were fair to the minority common shareholders. 
The plaintiffs' claims that Icahn's acquisition of the NOLs violated the Delaware [*2]statute prohibiting illegal gifts were also rejected. This Court determined that they were not direct claims, rather they were derivative claims that were extinguished by virtue of the 2011 Merger. The plaintiffs voluntarily dismissed the members of the Special Committees as individual defendants prior to trial. 
Findings of Fact
In January 2003, XO emerged from bankruptcy. Under XO's Bankruptcy Court-approved plan of reorganization, Icahn converted his pre-petition debt into 83% of XO's new equity and 85% of XO's debt under a $500 million credit facility (the "2003 Credit Facility")(See plaintiff Zheng's Sixth Amended Complaint, dated October 10, 2011 [the "Zheng Complaint"] at ¶ 4). The Bankruptcy Court also approved a tax allocation agreement (the "TAA") permitting defendant Starfire Holding Corp. (Icahn's affiliate) to use XO's NOLs. Under the TAA, "neither Icahn nor Starfire was required to compensate XO for the NOLs until XO itself became a taxpayer with the ability to use the NOLs" (Zheng Complaint, ¶ 41). As described below, XO subsequently entered into a new, amended, tax allocation agreement with Icahn (the "ATAA") as part of the 2008 Recapitalization, which transaction also included the issuance of two series of preferred shares (the "Series A Preferred Shares"[FN1]
and the "Series B Preferred Shares), as well as raising $300 million in cash to XO. Icahn paid a total consideration of $780 million. (See Ex. P-12C [XO's SEC Form 8-K, dated July 25, 2008]).
Since emerging from bankruptcy, in 2003, through 2008, XO has not earned any taxable income. (See Ex. P-193, ¶ 4 [April 12, 2010 Affidavit of Jordan Bleznick]).
The 2008 Recapitalization
Beginning in 2006, XO engaged in an effort to sell itself or its wireline assets to a third-party, and to this end retained Blue Fish Capital to assist with the almost a year and a half long marketing effort (Ex. D-4, at 1865 [at Tr. 34:3-35:10] & 1895 [at Tr. 155:16-156:6] [Knauss Dep.]). Blue Fish Capital sent information to "30 different possible bidders" (See, e.g., Tr. 315:18 [Knauss Test.]; Ex. P-7B). The minutes of the April 2, 2007 Meeting of XO's Board of Directors noted that XO had received 15 inquiries into the purchase of wireline assets. Nonetheless, the XO Board came to the conclusion that none of the proposals were viable. XO also engaged in discussions with Broadwing Corporation and PAETEC Holding Corp. ("PAETEC") regarding a potential strategic transaction. In October 2006, after those potential transactions failed to materialize (Ex. P-6F [Minutes of October 13, 2006 XO Board of Directors Meeting]; Ex. D-4, at 2342 [at Tr. 36:24-37:9] [Gradin Dep.]), the XO Board resolved to end its affirmative efforts to sell XO's wireline assets (Ex. P-6F).
In April 2007, PAETEC indicated an interest in a potential transaction involving the wireline assets, but no offer was forthcoming (Ex. P-7B [Minutes of the April 2, 2007 Meeting of XO's Board of Directors]; Ex. P-7C [Minutes of the April 28, 2007 Meeting of XO's Board of Directors]; Ex. D-4, at 2342 [at Tr. 36:24-37:22] [Gradin Dep.]).
By the end of 2007, XO's long-term debt consisted of $373.5 million in principal under the 2003 Credit Facility and $3.7 million of accrued interest (Zheng Complaint, ¶ 149). That [*3]debt was due July 2009. There is no dispute that the Series A Preferred Shares, in the amount of approximately $250 million, was required to be redeemed in 2010 (see Tr. 827:5-17 & 845:6-8 [Freiberg Test.]; Ex. P-222, ¶5 [Grivner Aff.]). XO was concerned that, absent a bridge loan, "XO's cash balance could drop to approximately $25 million by the first or second quarter of 2008, which would trigger numerous operational and accounting issues and a cash covenant [issue] under [the 2003 Credit Facility]" (Zheng Complaint, ¶59). XO also received advice from the Boston Consulting Group that XO would have to make increased capital expenditures if it intended "to drive future revenues and growth over the amount then provided for in its business plan." (Id.) 
This Court concludes that XO was in very poor financial condition. It needed additional funds to repay debt that was coming due, to address its cash flow concerns, and to fund any potential growth. In 2007, as a result of XO's financial condition, KPMG (XO's auditor) informed XO's Board that XO would receive a dire 'Going Concern' qualification if XO did not announce fundraising in its third quarter 2008 10-Q SEC Filing.
To address the XO's need for financing, the XO Board established the 2008 Special Committee, which was comprised of three outside directors: Robert Knauss ("Knauss), Adam Dell ("Dell") and Fredrick Gradin ("Gradin").[FN2]

The 2008 Special Committee hired Dechert LLP ("Dechert") and Cowen and Company ("Cowen") as its legal and financial advisors, respectively. XO also met with five investment banks to solicit assistance in raising financing (Ex. P-1C). XO found that outside funding sources were not readily available in the latter part of 2007 and 2008, and because of the financial crisis, the capital markets were virtually closed to even the highest quality borrowers (Zheng Complaint, ¶ 6). Both Moody's and S & P gave XO junk bond ratings (Zheng Complaint, ¶ 6; Ex. P-141 at 22; Ex. P-222, ¶ 5 [Grivner Aff.]). It was these economic conditions which led to XO agreeing to a deal with Icahn (at Tr. 265:22-266:16).
From late 2007 through Spring 2008, the 2008 Special Committee met with its advisors on numerous occasions to consider how best to address the company's cash flow and debt concerns (see, e.g., Zheng Complaint, ¶ 61; Exs. P-8A, P-1C, P-22, P-1D, P-1E, P-2F, P-8D & P- 7C).
Although XO received several inquiries regarding a sale, the board of directors concluded that a sale was not worth pursuing because no firm, fully-financed offers had been made. There was never in fact a "solid" or "bona fide" offer, merely an "indication" of interest (Tr. 319:22-320:17 [Knauss Test.] & Tr. 132:15-19 [Hill Test.]). That indication, as reflected by a tentative offer document, reflected a price, when adjusted for XO's negative working capital, of [*4]no more than forty or fifty cents per share. The 2008 Special Committee correctly determined it was not worth consideration (Ex. P-42; Tr. 320:10-17 [Knauss Test.]). 
Knauss, head of the 2008 Special Committee credibly testified that even if the tentative offer was fully financed, it would not have generated a sufficient price per share to be attractive to the minority shareholders or Icahn. The 2008 Special Committee realized that XO's time was running out. As their bankruptcy specialist advised, XO could go under if it did not finish a deal with Icahn, because of XO's cash situation (Tr. 349:20-351:19).
On April 17, 2008, the 2008 Special Committee met with Icahn to discuss restructuring XO's senior debt or extending the debt's maturities (Ex. P-8D at Bates-stamped p. "XO_R2_BR_002091-92 [April 18, 2008 Memorandum from R. Knauss to XO's Board of Directors re: Report on Financing Alternatives]). Icahn said that he would not extend the debt maturities, but would consider restructuring the debt. (Id.) Over the next several weeks, the 2008 Special Committee met with its advisors to assess Icahn's response. The 2008 Special Committee considered: (1) the size of the financing; (2) the likelihood that Icahn would not exchange secured debt for common shares; (3) the ability of XO to use its NOLs; and (4) that it would be important to extract valuable concessions from Icahn (see Ex. D-4, at 1860-61 [at Tr. 16-18], 1876 [at Tr. 79-81], 1879 [at Tr. 90-91], 1937 [at Tr. 244], 1964 [at Tr. 350-52] & 1986 [at Tr. 438] [Knauss Dep.]).
On July 17, 2008, after negotiations and its own deliberations throughout May and June of 2008, the 2008 Special Committee approved a full re-financing package. Several Icahn entities [FN3]
would exchange $450.8 million of debt and $329.2 million of cash for $555 million Class B, 7% convertible preferred shares at an exercise price of $1.50, and $225 million Class C, 9.5% perpetual preferred shares that was not convertible. 
As part of the 2008 Recapitalization, the 2008 Special Committee extracted: (1) the option to pay payment-in-kind ("PIK") dividends rather than cash; (2) a standstill agreement, sterilizing the voting power arising from Icahn's increased holdings (the "Standstill"); and (3) the ATAA, which provided that Starfire would pay XO up-front 30% of Starfire's NOL tax savings, up to $900 million (Tr. 302:20-25 & 397:20-22 [Knauss Test.]); Ex. P-2S [July 17, 2008 Special Committee Minutes]; Ex. P-12C [XO's SEC Form 8-K, dated July 28, 2008]). 
Cowen opined that the consideration paid to XO in the 2008 Recapitalization was fair to XO from a financial point of view (Exs. P-143 & P-142.)
XO offered certain of its large minority shareholders, including R2, the opportunity to participate in the 2008 Recapitalization. They declined.
Knauss, the head of the Special Committees, was extremely well qualified. He had previously served as dean of two law schools, and taught corporations, security regulation and for many years taught a seminar in corporate governance, and had served on other corporation's board of directors (Tr. 407:24-408:9 & Ex. P-228). He testified credibly regarding the negotiations leading to the consummation of the 2008 Recapitalization and the 2008 Special [*5]Committee's decision to refinance the XO's debt and obtain sufficient cash to fund its growth, business plan, and increase in working capital. He was well aware of the fact that Icahn wanted to get to eighty percent so he could use a portion of XO's NOLs, which the 2008 Special Committee could use as negotiating leverage (Tr. 303:15, 303:6-9); and reasonably concluded that for any third-party offer to make sense as an alternative, it would have to have been at least $1.3 billion, which never materialized (Tr. 63:8-13). The 2008 Special Committee's advisers JP Morgan & Chase Co. ("JP Morgan") and Dechert approved of the ATAA in connection with the 2008 Recapitalization (Tr. 403:2-5). In addition, the original TAA had already been approved by the Bankruptcy Court (Tr. 404:3-405:7 & 300:18-302:19). 
The plaintiffs contend that the structure of the 2008 Recapitalization incentivized Icahn to keep the market price of the common shares stock depressed, below $2.00 per share (see, e.g. Zheng Complaint, ¶ 11). However, at trial they offered no evidence to support this contention, which was contradicted by the testimony of Grivner, XO's former C.E.O., and XO's former C.F.O., and Gregory Freiberg ("Freiberg"). Those two former officers testified that the value of the convertible feature of the Series B Preferred Shares would increase as the market price of the common shares increases, even if the market price remains below the convertible exercise price (see Tr. 566:19-24 & 572:19-573:18 [Grivner Test.; Tr. 858-59 [Freiberg Test.]).
Further, Grivner also expressly denied planning, or engaging in any actions, to depress XO's stock price (Ex. P-222, ¶ 10-11 [Grivner Aff.]). Moreover, Cowen's Aaron Hill ("Hill") also testified that he did not believe there was anything about the Series B Preferred Shares that incentivized Mr. Icahn to do anything to keep the market price of XO low (Tr. 153:24-154:2).
The 2008 Special Committee vigorously negotiated with Icahn, and otherwise engaged in a fair process. This is also evidenced by the testimony of Freiberg as relates to the negotiations leading to the 2008 Recapitalization and the 20:1 participation ratio ultimately available to minority shareholders concerning the preferred shares to be issued.
This is also evidenced by the testimony of its outside counsel, Dechert's Sander Bieber, that there was "a great frustration shared by Mr. Icahn and members of ACF...that they were pretty much fed up with the process that had gone on over several years" (Ex. D-4, at 2896 [at Tr. 170:18-21]).
The plaintiffs' premise that the 2008 Recapitalization was inappropriate was belied by Freiberg in the following exchange with the Court:
THE COURT: Am I correct that if Mr. Icahn was unable to achieve the 80 percent, this deal was not going to go down?
THE WITNESS: I didn't think that, your Honor. I wanted to believe Mr. Icahn supported the company regardless if he could avail to the NOLs or not.
THE COURT: Do you think he would have paid — invested
the same amount if he could not avail himself the NOLs? Wasn't that the only real benefit he was getting out of this deal other than the fact that he owned more of XO?
THE WITNESS: We wanted to transform the business. We needed to find capital to invest into the business. We were hoping that the value we would create from the business with an investment would be the incentive for him to put money in and then the availing of the NOLs was ancillary to that core premise.
THE COURT: From his perspective or from your perspective?
THE WITNESS: From his perspective and from my perspective.
THE COURT: Do you conclude that it was not that important from his perspective?
THE WITNESS: I do think it was important. I believe that more important was we were trying to invest and grow and create value with the core business.
THE COURT: When you say, "We," —
THE WITNESS: The management team.
THE COURT: That's not including Mr. Icahn.
THE WITNESS: Correct, correct.
THE COURT: You want his money.
THE WITNESS: Yes, your Honor. (Tr. 800:25-802:25).
The 2008 Special Committee understood that XO's NOLs were, for all practical purposes, of negligible value to a third-party purchaser due to limitations in the tax laws. At a May 21, 2008 meeting, the 2008 Special Committee discussed at length the value of the NOLs to XO in a third-party sale, but tax counsel, Dechert's Michael Hirschfeld ("Hirschfeld"), advised that "if there was a change in control resulting from a sale to a third-party, the NOL limitations could apply (depending on the purchase price) (Ex. P-2J). Knauss asked Hirschfeld what would happen to the NOLs in a third-party sale for $1 billion, and was advised that "up to $45 million could be used each year, although other NOL restrictions could apply to limit usage, but at a rate of $45 million a year, most of the NOLs of [XO] would actually expire before the company would be able to use them." Id.
Hill, of Cowen, the 2008 Special Committee's financial advisor, also confirmed XO's dire need to refinance its debt in 2008. Credit was tightening in the second half of 2007 and beginning of 2008, which made it more challenging for XO to raise money from outside sources (Tr. 28:7-11; 59:8-14). In addition, the specter of bankruptcy was raised as a possibility in May 2008 (Tr. 50:15-19); the indications of interest were not bona fide offers (Tr. 132:15-19); and the dire consequences of a "Going Concern" qualification (Tr. 157:22-158:8).
Knauss testified that the 2008 Special Committee was "challenged to look at various alternatives" to doing a deal with Icahn, during a "very tough period, which continued several years" and "talked to various people" and "looked at various opportunities" but that it was difficult to get financing even from Icahn, and that the 2008 Special Committee's financial advisor, Cowen, told it that XO's bonds were then "basically junk bonds." (See Tr. 234:9-26.). Grivner testified that XO did not grow as fast as it should have because of the economy (Tr. 561:21-24).
There was no proof offered that Icahn, or any other defendant, interfered with, pressured, intimidated or dominated, the 2008 Special Committee (or its legal and financial advisors), or engaged in any bad faith conduct. 
Stan Keller's ("Keller"), the plaintiff's expert, opinion that the 2008 Special Committee was not well-functioning is also belied by the context in which the 2008 Special Committee's performance must be evaluated:
a. The 2008 Special Committee's negotiations with Icahn must be assessed in light of XO's financial and strategic position from 2007. XO faced an urgent need for additional capital in order to avoid bankruptcy and achieve its business plan. Icahn's status as XO's controlling [*6]stockholder entitled him to vote against any transaction requiring a stockholder vote, and entitled him to a premium were he to give up control. The 2008 Special Committees also knew that the NOLs were of limited value to the Company for the foreseeable future and were likewise of limited value to a third-party buyer, limiting the NOLs' value to anyone other than Icahn;
b. It is undisputed that XO never turned a profit and regularly needed capital;
c. The 2008 Special Committee understood that a failure to obtain new investment capital, either through a sale or a restructuring, could mean another XO bankruptcy (see Ex. P-2M [June 6, 2008 Minutes of Special Committee: "Mr. Knauss pointed out that the Committee job [sic] was to protect the interests of the minority shareholders while acting in the best interest of the Company by keeping it out of bankruptcy"]);
d. The 2008 Special Committee was advised by a financial advisory firm, Navigant LLC ("Navigant"), that in the event of a U.S. Bankruptcy Code Chapter 7 liquidation, a Section 363 sale of the Company's assets as a going concern under Chapter 11 and a Chapter 11 reorganization, there would be no expected recovery to the minority shareholders (see Ex. P-2S [July 17, 2008 Minutes of the Special Committee]);
e. XO's difficult financial position impacted the ability of both the Special Committees to negotiate. The 2008 Special Committee's ability to put pressure on Icahn was reduced by the fact that Icahn had the alternative of waiting for the XO's debt to come due, forcing a bankruptcy in which the minority stockholders would likely recover nothing. Both the Special Committees and Icahn knew that although the Special Committees were able to say "no" in the short term — indeed, between the 2008 and 2011 transactions, Knauss, Gradin and Dell rejected two of Icahn's offers — the Special Committees needed strategic transactions to get XO out of its financial difficulties and obtain the best result for the company and its stockholders;
f. Icahn was not obligated to forgive the XO's debts or to vote his shares in favor of a transaction with a third-party. Icahn could walk away from the table and allow the XO to slip into bankruptcy;
g. Early valuations by Cowen or XO's financial advisor, Morgan Stanley, provide an incomplete picture. Thus, neither Cowen nor Morgan Stanley stated that such a hypothetical $1 billion cash sale would generate $2.29 per share for minority stockholders. The presentations merely provide a per-share price for the XO as an entire company, on the assumption that Icahn would agree to sell his controlling shares for the same price as the minority. 
Keller does not explain (nor do those presentations suggest) why Icahn would consent to sell his shares without receiving a control premium. That preliminary, pro forma banker analyses do not discuss this question is understandable, especially as there was not an actual $1 billion offer to consider. In short, Icahn's negotiating position was the converse of the 2008 Special Committee: Icahn could walk away from the table and leave XO to struggle on with its current business plan (and a possible bankruptcy). While XO could, perhaps, have sought an alternate source of debt financing, third-party refinancing was unlikely to be available. Morgan Stanley's Jon Yourkoski pointed out: "I would say that at the time [of the 2008 Recapitalization] XO did not have access to other forms of capital" (Ex. D-4, at 2143 [at Tr. 134:21-135:2] [Yourkoski Dep.]), and Grivner described XO's inability in 2008 to get a "B" rating from the Moody's Financial Services (so that it could repay XO's obligations at a manageable interest rate) and its unsuccessful efforts talking with several large banks (see Ex. P-222, ¶ 5 [Grivner Aff.]);
h. At a May 21, 2008 meeting, the 2008 Special Committee discussed at length the value of the NOLs to the company and in a third-party sale. Counsel advised the 2008 Special Committee that "Delaware courts would likely find that the NOLs are an asset of the corporation, even though no other person could use it to the same extent that Mr. Icahn and his affiliates could" (Ex. P-2K [May 21, 2008 Minutes of the Special Committee]). Thus, at the time of the 2008 Recapitalization, the 2008 Special Committee knew that the NOLs, while potentially of great value to Icahn, were of limited value to XO (which had no current profits against which they could be used or expectation that they could be used for several years) or any other potential buyer (see Ex. P-2R; Tr. 309:2-5 [Knauss Test.]). The 2008 Special Committee was further aware that Icahn might be able to obtain the NOLs from the XO in a bankruptcy sale (Ex. P-2K);
i. Because the NOLs were of higher value to Icahn than to anyone else, the NOLs did not provide the 2008 Special Committee with significant negotiating leverage. The 2008 Special Committee had no plausible "next-best" option with respect to the NOLs: they could either (i) sell them to Icahn, (ii) do nothing, potentially putting XO into a bankruptcy in which minority stockholders were unlikely to recover any value; or (iii) attempt to keep the NOLs in a third-party M & A transaction (which would require Icahn's consent). Moreover, because the NOLs had limited value to third-parties, a "market check" canvass of third-parties would have been of little assistance to the 2008 Special Committee in determining the value of the NOLs to Icahn, and thus would not have provided significant additional leverage in negotiations with Icahn; and
j. Given these circumstances, a specific valuation of the NOLs from Cowen or further information from Icahn would have been of marginal value at best. However valuable the NOLs were to Icahn, they had limited value to any other party.
In any event, in an arm's-length transaction, a purchaser would not be required to reveal to a cash-strapped seller what the asset is worth to the buyer. The market price for the NOLs was not their value to Icahn, but the price at which they would change hands in a negotiated transaction.
The 2008 Special Committee
In light of the above and XO's dire financial condition in 2008, the 2008 Special Committee was well-functioning and the process was fair.
As this Court has previously held, the members of the 2008 Special Committee were independent and disinterested. None of them were on both sides of the transaction, were personally interested in the transaction, nor were beholden to Icahn. Based on this Court's review of the record, we conclude that Knauss, Dell and Gradin were independent and disinterested and capable of fulfilling their roles as the 2008 Special Committee members.
The 2008 Special Committee began by retaining Cowen as financial advisor and Dechert as legal advisor. The 2008 Special Committee then went further, retaining additional advisors with special expertise, including Delaware counsel at Bouchard Margules and, later, Navigant, a financial advisor brought in to address bankruptcy-related issues. 
With the assistance of its advisors, the 2008 Special Committee approached its task with diligence. From October 2007 through July 2008, the 2008 Special Committee conducted over twenty special committee meetings, reflecting an active, engaged and informed special committee. The record of the 2008 Special Committee's activities reflects the 2008 Special [*7]Committee and its advisors dealing with key issues: XO's financial difficulties; Icahn's ability to veto other strategic transactions; expressions of interest from potential third-party bidders; and how to extract value for concessions relating to XO's NOLs, even though the NOLs were worth less to XO or to a third-party than to Icahn.
The 2008 Special Committee was not dominated by Icahn and it did not defer to him. It considered alternatives, pushed back, and obtained meaningful benefits for the Company and its minority stockholders. 
The 2008 Special Committee informed itself regarding the bankruptcy alternative. The 2008 Special Committee retained Navigant specifically to "express a view of the potential impact on the business of the Company of a bankruptcy filing and the distributable assets available for minority holders" (Ex. P-2Q [July 14, 2008 Special Committee Minutes]). Navigant concluded that there would be no expected recovery to XO's minority stockholders in a bankruptcy, making a refinancing with Icahn superior option (see Ex. P-2S [July 17, 2008 Special Committee Minutes]). The fact that the 2008 Special Committee was asking questions relating to potentially returning XO to bankruptcy rather than reaching agreement with Icahn, also reflects that it was a well-functioning special committee.
The 2008 Special Committee obtained a standstill ("Standstill") under which Icahn and his affiliates agreed not to engage in certain transactions that would result in Icahn's ownership of 90% of the voting shares of XO, unless as a result of a tender offer in which a majority of minority stockholders tendered their shares or a merger approved by a special committee of disinterested directors. Without the Standstill, Icahn could have later sought to eliminate the minority stockholders through a short-form merger under 8 Del. C. § 253, a summary process that does not include the "fair dealing" component of entire fairness and relegates minority stockholders to appraisal.
With respect to XO's NOLs, the TAA only required Icahn to make payments for using the NOLs in years where XO could have used them. Had this arrangement been continued in the 2008 Recapitalization, Icahn would have been free to use the NOLs without making any payments to XO for the foreseeable future. The 2008 Special Committee successfully sought to renegotiate the TAA and obtained the ATAA, under which XO would get 30% of certain NOL tax benefits exploited by Icahn, regardless of whether XO could have itself used the NOLs.
The plaintiffs claimed that the 2008 Special Committee disregarded the advice of its advisors to conduct a rights offering. The evidence does not support their claim. Nothing in Cowen's analysis provided to the 2008 Special Committee suggests an upper limit on the amount of the rights offering, or that the only financing alternative was a rights offering (see Ex. P-52 [discussion materials attached to May 1, 2008 Aaron Hill e-mail]). The plaintiffs offered no evidence suggesting that a rights offering was even possible without a backstop, that anyone but Icahn would be willing to backstop the offering, or that Icahn would have been willing (or required) to backstop a smaller rights offering that did not get him to 80% ownership — which was his incentive to refinance the debt. In addition, Cowen's analysis that the plaintiffs cite are dated from well before the 2008 Recapitalization was consummated. To the extent that Cowen may have been recommending an alternative transaction with a third-party, Knauss testified that the Special Committee was sensitive to the fact that Cowen would receive a higher fee for such a transaction (see Tr. 362 [Knauss Test.]).
The 2008 Special Committee did not acquiesce to any demand of Icahn regarding the size of the private placement financing. Its decision regarding the ultimate size of the 2008 Recapitalization was made on the basis of an assessment of the XO's business needs as expressed by management. At its May 30, 2008 meeting, Freiberg, XO's C.F.O. at the time, told the 2008 Special Committee that XO would need a total of $797 million to pay off debt and accomplish its business plan, and recommended an $800 million capital raise (see Ex. P-2L (May 30, 2008 Special Committee Minutes); (Ex. D-4, at 1893 (at Tr. 146:21-147:7) [Knauss Dep.]). The amounts needed for capital expenditures, "in order to make XO viable in a very tough market," was based on advice from Boston Consulting Group (Tr. 267:6-24 [Knauss Test.]). The size of the offering was reasonable, because a smaller capital offering would likely have been disastrous given the economic conditions in late 2008 and 2009. It was most unlikely that XO would have been able to raise any financing in 2008 and 2009 given the state of the markets (Ex. D-2, ¶ 33). There was no evidence of a "supersized preferred shares private placement" or "idle cash" as alleged by the plaintiffs (Zheng Complaint, ¶¶ 8, 128). 
The fact that the 2008 Recapitalization as finally negotiated provided for minority stockholders to participate in the offering on a diluted 1:20 basis relative to Icahn does not reflect a flawed process. It was the result of vigorous negotiations. 
The plaintiffs' allegation that the 2008 Recapitalization was unfairly priced and was structurally unfair to the minority shareholders is based on a claim that their shares were diluted and that the 2008 Recapitalization incorporated a "giveaway" of the NOLs to Icahn. However, the plaintiffs suffered no harm from being diluted in 2008, and this Court finds that there was no giveaway and, has previously dismissed a claim that this aspect of the 2008 Recapitalization was a violation of a Delaware statute (8 Del. C. § 122) (see January 2013 Order, 2013 WL 363410, at *9).
The Expert Opinions
The plaintiffs relied on the expert opinion of Rajiv B. Gokhale ("Gokhale") — an Executive Vice President of Compass Lexecon — to support their valuation claims. 
Gokhale maintained that his valuation of XO's "common shares as of July 25, 2008 is relevant because: (1) the terms of the preferred shares helped transfer value to Icahn and (2) fair value factors into a calculation of the unjust enrichment to the Icahn resulting from the issuance of the preferred shares in the 2008 [Recapitalization]" (Ex P-17A, at ¶ 8).
However, the relevant factor as to price is whether XO received fair consideration, and, as the 2008 Special Committee's financial advisor, Cowen, opined at the time of the transaction, the 2008 Recapitalization was fair to XO from a financial standpoint (see Exs. P-143 & P-142). Thus, the evidence established that XO received fair consideration for the preferred shares it issued and the ATAA regarding how NOLs would be used and for what consideration. 
The defendants relied on the opinion of their expert, John "Jack" Kane, ASA, CFA ("Kane") who is a Managing Director in the Valuation Advisory Services practice at Duff & Phelps LLC.
More specifically with regard to the qualifications of the two experts, each of them states that he holds an MBA degree, and has served as expert witnesses in various litigation proceedings. With respect to their experience in the valuation of companies: 
a.Gokhale stated that he specializes "in the application of economics to a variety of [*8]legal and regulatory issues" and "specialize[s] in the areas of financial economics and business valuation and [his] experience covers a wide array of industries." He notes that he has been admitted as a valuation expert in Delaware's Chancery Court and testified on behalf of the U.S. Federal Trade Commission in the U.S. Court for the District of Columbia (Ex. P-17A, ¶ 1).
b.Kane's direct testimony affidavit (Ex. D-2) indicates that he has substantial experience in valuation of companies, particularly companies in the telecom sector, which offer services such as provided by XO. He states that he is a Managing Director at Duff & Phelps LLC's Valuation Advisory Services practice, specializing "in the Communications, Entertainment and Media Industries and is "particularly knowledgeable in industries including cable television, broadcast television and radio, filmed entertainment and programming, wireline and wireless telecommunications, publishing, and sports teams and venues" and that he has "been accepted as an expert in the media/communications industry in Federal Courts, U.S. Bankruptcy Courts, various trial courts, various administrative hearing boards, and the American Arbitration Association."
Based on the evidence, this Court finds Kane's opinion to be most credible and consistent with the evidence adduced at trial (much of which was conceded by Gokhale) as follows:

 a. The 2008 Recapitalization included both the ATAA, and the exchange of senior secured debt for preferred shares (Ex. D-2, ¶ 54 [Kane Aff.]);


 b. The preferred shares and ATAA were transacted at fair value in tandem as part of the 2008 Recapitalization (Ex. D-2, ¶¶ 55-56 [Kane Aff.]);


 c. XO's common shares closed at $0.42 on July 24, 2008, and $0.40 on July 25, 2008, just before the 2008 Recapitalization was undertaken. On July 28, 2008, after the 2008 Recapitalization, the price of XO's common shares increased to $0.63 (see Tr. 1036:20-23 (Kane Test.); Ex. D-2, ¶94 [Kane Aff.]; Ex. P-17A, at ¶¶ 41-42 [Gokhale Aff.]);


 d. XO's share price of $0.42 on July 24, 2008 reflected XO's "debt-laden" capital structure" (Ex. P-17A, ¶¶ 41-42 [Gokhale Aff.]);


 e. XO's share price of $0.63 on July 28, 2008 reflected XO's "new" structure (Ex. P-17A, ¶¶ 41-42 [Gokhale Aff.]);


 f. The 2008 Recapitalization resulted in an increase in the price of XO's common shares, from $0.42 to $0.63, therefore the market considered the transaction to be good for shareholders (Tr. 1036:13-1037:16 (Kane Test.);


 g. Based on the financial metrics of XO, the company's implied synthetic credit rating is between "B-" and "B" (Ex. D-2, ¶ 41 [Kane Aff.]);


 h. XO had sought credit ratings from ratings agencies in connection with potential debt financing and had received verbal senior secured ratings of "B3" and "B-" from Moody's and S & P, respectively (Ex. D-2, ¶ 41 [Kane Aff.]; Ex. P-158 at Bates-stamped p. "C 003061");


 i. A yield of 9.5 percent is within a range of reasonableness for the Preferred Shares issued to Icahn in connection with the 2008 Recapitalization (Ex. D-2, ¶ 12 [Kane Aff.]);


 j. The Preferred Shares were issued at or below fair value (i.e. XO received a benefit when it issued the Preferred Shares) (Ex. D-2, ¶ 12 [Kane Aff.]);


 k. The fair value of the Preferred Shares issued to Icahn in connection with the 2008 Recapitalization was $490.7 million (Ex. D-2, ¶¶ 46-47 [Kane Aff.]);


 l. The Icahn paid $555.0 million for the Preferred Shares (Ex. D-2, ¶ 47 [Kane Aff.]; Ex. P-158 at p. 3 (Bates-stamped p. "C 003035"));


 m. The difference between what was paid by Icahn for the Preferred Shares, $555.0 million, and the fair value of the Preferred Shares, $490.7 million, represents a benefit accrued to XO of $64.3 million (i.e., $555.0 minus $490.7) in issuing the convertible Preferred Shares at a 7% yield (Ex. D-2, ¶ 47 [Kane Aff.]);


 n. The yield on the preferred shares was lower than it should have been (Ex. D-2, ¶¶ 12, 48 [Kane Aff.]);


 o. The Preferred Shares were issued below fair value (i.e. XO received a benefit when it issued the Series B Preferred Shares) (Ex. D-2, ¶ 12 & ¶¶ 47-48 [Kane Aff.]);p. Freiberg, stated in an e-mail that it would be better for XO to adopt the ATAA than to remain with the TAA (see July 17, 2013 Expert Report of Jack Kane, ASA, CFA, attached to Ex. P-2 (herein, "Kane Report"), at ¶81; Ex. P-134 (July 14, 2008 e-mail from G. Freiberg)); and

q. The estimated value to XO of entering into the ATAA ranged from a loss of $32.1 million to a gain of $24.2 million (Ex. D-2, ¶ 53 [Kane Aff.]).
The 2008 Recapitalization not only eliminated XO's debt and thus avoided a "going concern" qualification and possible bankruptcy, it also generated $300 million in cash, which XO could use to fund its capital expansion business plan and/or fund the mandatory redemption of the Series A Preferred Shares coming due in 2010, which shares were partly owned by Icahn and partly owned by public shareholders (Tr. 267:6-24 & 409:6-9 [Knauss Test.]).

Although the plaintiffs claim that the 2008 Recapitalization's issuance of the Preferred Shares diluted the interests of the plaintiffs and other minority shares, they offered no evidence that the shares held by the minority shareholders were worth less as a result of the 2008 Recapitalization and the common shares's market price increased by approximately 58% immediately after the transaction was publicly announced (see Ex. D-3 [price increase from $0.40 per share on Friday, July 25, 2008 to $0.63 on the following Monday, July 28]).
Because the minority shareholders did not avail themselves of the right to participate in the offering, the result of the 2008 Recapitalization was that Icahn increased his equity position from a little over fifty percent to eighty percent. The 2008 Recapitalization did reduce the minority shareholders percentage, but they were already minority shareholders to begin with, and the minority shareholders had no control position either before or after the 2008 Recapitalization, including no ability to elect members of the XO Board.
Gokhale's analysis and options were fundamentally flawed, as pointed out by Kane's direct testimony affidavit, with regard to both the value of XO equity which, was irrelevant as concerns the 2008 Recapitalization. Even assuming that the value of XO's shares in 2008 were relevant, the plaintiffs offered no evidence that the structure or the price of the 2008 Recapitalization was unfair to them and their fellow minority shareholders.
All three valuation analyses that Gokhale considers — the discounted cash flow ("DCF') methodology, the comparable company methodology, and the comparable transaction methodology — were flawed, and therefore Gokhale's $2.59 share price is unreliable (as is his $2.45 price, which relies on the same methodologies) (Ex. D-2, ¶¶ 57-58; Kane Rebuttal, ¶¶ 6-7). [*9]When those errors are corrected, the result is a value of $0.38 per share as of the 2008 Valuation Date (Ex. D-2, ¶ 96; Kane Rebuttal, ¶ 6, ¶ 82).[FN4]
This Court finds that the "comparable company" methodology and "comparable transaction" methodology (the "Market Approach"), involved companies and transactions that are not comparable enough to XO or the 2008 Recapitalization to rely on.
Assuming that the valuation of XO's common shares as of July 25, 2008 were relevant, the evidence demonstrated that they were then worth merely $0.38 per share (slightly less than the $.40 publicly traded stock price), and that Icahn was not unjustly enriched by the 2008 Recapitalization. The evidence demonstrated that the transaction was fair and substantially benefitted XO and the minority shareholders. XO had: (a) $473 million of debt that was bearing interest at nearly 12% (Ex. P-10A at 23, 50-51) which had to be repaid on July 15, 2009 (Ex. P-12C at 2), and (b) $275 million of Series A Preferred Shares that was redeemable in early 2010. Those obligations were funded by ACF paying $780 million for preferred shares that Cowen opined was issued at fair value, and that Kane calculates to have been issued at or below fair value. The ATAA was also issued at fair value based on relevant factors as of July 25, 2008 (see Ex. D-2, ¶ 13). 
This Court finds that the 2008 Recapitalization was fair and substantially benefitted XO and the minority shareholders because: (a) it eliminated XO's debt, (b) the dividends on the Preferred Shares could be paid in kind, rather than in cash,[FN5]
(c) far from being unfairly accretive, the PIK dividends enable XO to conserve $150 million in much needed cash between 2008 and [*10]2011 with which it could fund its business plan, and (d) it also provided XO with a potential long-term future benefit of more cash if Icahn used any of XO's NOLs, at a time where there was no reasonable prospect that XO could use any NOLs.
The 2011 Merger
The plaintiffs allege that the 2011 Special Committee was not well-functioning, and that resulted in a flawed process concerning the 2011 Merger. They rely on the fact that 2011 Special Committee did not conduct a market check. 
Between 2009 and 2011, no third-party had expressed any credible interest in purchasing XO. No third-party came forward with an alternative bid in 2011, despite the very public nature of a bid by ACF, which was reflected in, inter alia, a Form 13D/A filing with the S.E.C. (see, e.g., Ex. P-13L). Icahn's statement that he was not interested in selling XO did not stop any third-party from contacting the 2011 Special Committee at any time between 2009 and the consummation of the 2011 Merger. At trial, it was established that no one did.
In view of XO's low stock price, a market check carried risk. Knauss testified that he was well aware that a market check or an auction might very well result in a price substantially below the $1.40 negotiated — that is, significantly less than what one might get from a controlling shareholder who has an opportunity to get a benefit, that third-party bidders cannot get, to wit, use of the NOLs. (Tr. 408:7-18).
The risk consisted of damaging XO's ability to attract and retain customers. Knauss testified that XO was losing customers and "[o]ne of the problems with the churn [XO losing customers] was the company was constantly up for sale and people who were trying to market the company and market contracts were always complaining that the company was at play, and the big contractors weren't interested, or less interested in doing business with them." (Tr. 230:5-9.). In addition, Knauss noted that, "the marketing people, the chief executive officer, chief operating officer were never very happy about the fact that the company was always on the market" (Tr. 231:2-4).
This was corroborated by Icahn, who testified that "management was complaining that you had all these companies, you know, just looking at us. They couldn't afford us and they were just getting a free look and it was hurting the business" (Tr. 464:22-465:18). After 2008 and extending into 2011 neither Icahn nor XO management wanted to put XO in play again after failing to find a buyer with a credible offer (Tr. 290:5-291:2 & 284:2-8). 
The trial testimony of Knauss and Icahn was consistent with the XO Board's June 24, 2008 minutes, which indicated management's and Icahn's concerns about having a competitor continue to scrutinize XO pending implementation of the agreed-to proposed financing (which scrutiny was happening as part of the 2011 Special Committee's dual process of considering both strategic alternatives and financing options) (Ex. P-8E). After those two attempts by Icahn, via ACF, to take XO private in 2009 — both of which were rejected by the independent 2011 Special Committee — ACF made a third proposal to take XO private on January 19, 2011 , this time for $0.70 per share (the "2011 ACF Proposal") (Zheng Complaint, ¶ 176; R2 Complaint, ¶ 175; Ex. P-13I [S.E.C. Schedule 13D]). ACF made clear (as it had previously done during its two prior attempts to take XO private) that it was a buyer and did not wish to sell. (Id.). In response, the XO Board appointed the 2011 Special Committee, initially comprised of Knauss, Gradin and Harold First (Zheng Complaint, ¶ 177; Ex. P-9A). 
The 2011 Special Committee was authorized to negotiate and structure a transaction, reject ACF's proposal, or consider any other response the 2011 Special Committee deemed to be in the best interests of XO and its stockholders (Ex. P-9A).
As part of its diligence in maintaining the independence of the 2011 Special Committee, Dechert learned that First had been employed by an Icahn affiliate 17 years earlier and determined that the 2011 Special Committee should be limited to Knauss and Gradin (Ex. D-4, at 2889, at Tr. 143:17-144:16 [Bieber Dep.]).
On April 11, 26, and 29, the 2011 Special Committee held meetings with its advisors, discussing various topics, including possible strategic alternatives to the 2011 ACF Proposal and the limitations imposed by ACF's refusal to be a seller, received legal advice as to its fiduciary duties in connection with the potential transaction, and discussed J.P. Morgan's due diligence, with the 2011 Special Committee seeking confirmation that J.P. Morgan was receiving full cooperation and timely responses from XO (Exs. P-15A, P-4H & P-4I & Ex. P-204).
On April 27, 2011, at the direction of the 2011 Special Committee, representatives of J.P. Morgan met with representatives of ACF to discuss the 2011 ACF Proposal (Ex. P-15A). The outcome of those discussions was reported to the 2011 Special Committee and J.P. Morgan's diligence continued through May (Ex. P-4J).
From May 20 through June 3, 2011, the Special Committee met four additional times (see Ex. P-4J—4M [XO board minutes]). During those meetings J.P. Morgan discussed XO management's financial forecast and a number of other topics including: (a) XO's capital structure, (b) the Company's tax attributes, and (c) ACF's ability to utilize certain of the XO's NOLs (Id.). As a result of those meetings, and the advice of J.P. Morgan, the 2011 Special Committee concluded that, given XO's lack of profitability and continuing cash burn, the standalone equity value of XO was, at most, about $0.74 per share, and might be negative (Ex. P-209 at 29 & 30; Ex. D-4, at 1072 [at Tr. 39-40] & 1084 [at Tr. 187] [Knauss Dep.]).
Thus, the 2011 Special Committee concluded that, even taking the value of XO's NOLs to ACF into account, obtaining as much as $1.20 in a merger would be a "great" price (Ex. D-4, at 1072 [at Tr. 38] & 1079 [at Tr. 120] [Knauss Dep.]; Ex. D-4, at 1194 [at Tr. 140-41] [Zakkour Dep.]). There were two factors that justified this conclusion. First, XO was again low on cash, and given its disappointing performance and prospects, further financing was uncertain. Consequently, XO could face a second bankruptcy — in which minority stockholders would likely get nothing (Ex. D-4, at 2897, at Tr. 176-77 [Bieber Dep.]; Ex. D-4, at 1193, at Tr. 132-33 [Zakkour Dep.]). Second, XO's existing preferred shares continued to accrete at a rate of approximately 8% per year. Thus, even if the value of XO increased, the value of its common shares would decrease unless XO's value increased at more than 8% per year — which the 2011 Special Committee and J.P. Morgan did not think likely to occur (Ex. D-4, at 1080-81, at Tr. 158-59, 162; Ex. D-4, at 1192, at Tr. 123 [Zakkour Dep.]).
By June 3, 2011, the 2011 Special Committee had formulated a strategy of asking ACF to shop XO or to give minority stockholders a so-called "contractual (or "contingent") value right" (herein, "CVR") tied to the use of XO's NOLs by defendant Starfire (an affiliate of ACF) — fully expecting ACF to reject both proposals — and then insisting on a blowout price instead (Ex. D-4, at 1075-76, at Tr. 79-81, 85-86 & Ex. D-4, at 1082-83, at Tr. 179-82 [Knauss Dep.]; Ex. D-4, at 2896, at Tr. 170 [Bieber Dep.]).
The 2011 Special Committee and its advisors met with ACF on June 7, 2011, and the 2011 Special Committee presented ACF with a "negotiating document" highlighting high values, in an effort to drive the price up (Ex. P-219; Ex. D-4, at 1078, at Tr. 115 [Knauss Dep.]; Ex. D-4, at 1190, at Tr. 110 [Zakkour Dep.]). The 2011 Special Committee's actual analysis, which was never shared with ACF, contained far lower numbers. Indeed, as indicated above, J.P. Morgan concluded on the basis of its cash flow analysis, that XO's common shares had a negative value, even after including the value of the NOLs that XO expected to use or to share in under its existing tax sharing agreement with affiliates of ACF (Ex. P-218 at 13). The 2011 Special Committee never revealed its "bottom line" price, which was $1.20 per share or less; rather it held out for, and achieved, a higher price.
The 2011 Special Committee began the June 7 meeting by proposing that: (a) it be permitted to shop XO (which ACF rejected on the ground that it was not a seller, and such shopping would be unlikely to elicit new buyers, but would harm XO), and (b) ACF provide stockholders with a CVR that would allow stockholders to share in the benefits to Starfire of any use of XO's NOLs (which ACF rejected as likely to lead to more litigation with R2 over how and when NOLs were used) (Ex. D-4, at 1075, at Tr. 81-82 [Knauss Dep.]; Ex. D-4, at 1195-96 (at Tr. 201-02) [Zakkour Dep.]). When ACF rejected those proposals, the 2011 Special Committee (which conducted the negotiations directly), demanded, pursuant to its pre-planned strategy, that ACF pay $1.50 per share — more than double the $0.70 offer price (Ex. D-4, at 2896 [at Tr. 171-72] [Bieber Dep.]; Ex. D-4, at 3066 [at Tr. 442] [Icahn Dep.]). ACF then offered $1.10 a share. (Ex. D-4, at 2896 [at Tr. 171] [Bieber Dep.]; accord, Ex. D-4, at 3066 [at Tr. 442] [Icahn Dep.]). The 2011 Special Committee rejected that price (Ex. D-4, at 1194 [at Tr. 138] [Zakkour Dep.])
In response to the 2011 Special Committee's inquiries, Icahn stated several times that he had no plans to sell XO or its assets if the merger were approved (Ex. D-4, at 2894, at Tr. 163 [Bieber Dep.]; Ex. D-4, at 3043 [at Tr. 351] [Icahn Dep.]). The 2011 Special Committee then offered $1.40 per share, which was only ten cents less than the Committee's opening demand, coupled with a one-year CVR — which two financial advisors had previously suggested — as a means of so-called "flip insurance," to protect the minority stockholders against a quick re-sale/profit by Icahn — or $1.35 per share with an 18-month CVR (Ex. P-4N; Ex. D-4, at 2898, at Tr. 180 [Bieber Dep.]; Ex. D-4, at 3043 [at Tr. 351-52] [Icahn Dep.]; Ex. D-4, at 1194 at Tr. 139 [Zakkour Dep.]; Ex. D-4, at 3066 [at Tr. 442] & 3068 [at Tr. 449] [Icahn Dep.]).
Subsequently, ACF said that the 2011 Special Committee could pick either of the two potential structures (Ex. D-4, at 3068 [at Tr. 450] [Icahn Dep.]). The 2011 Special Committee felt that getting the extra five cents per share would be more attractive to the minority stockholders than the longer CVR term (see, e.g., Ex. P-15A at 8; Ex. D-4, at 2899, at Tr. 185:25 [Bieber Dep.] [the "committee wanted to get more cash if they could"]).
ACF believed that the $1.40 price was more than XO was worth, but the company was burning cash, would need to be refinanced again, and in the past, each time it infused capital into XO it was attacked or sued by a small group of malcontents (Ex. D-4, at 3041 [at Tr. 341-42] [Icahn Dep.]).
In the weeks following the June 7 meeting, the 2011 Special Committee, together with representatives from J.P. Morgan, Dechert and Richards Layton, negotiated the final terms of the [*11]2011 Merger Agreement (Exs. P-15A; P-4O; P-4P; P-4Q & P-4R).
On July 11, 2011, the 2011 Special Committee met with its legal advisors to review its fiduciary duties relating to the 2011 ACF Proposal and met with both its legal and financial advisors to consider whether a merger with ACF was advisable, fair to and in the best interests of XO and its minority stockholders. Ex. P-4S. J.P. Morgan issued a fairness opinion that the 2011 Merger would be fair from a financial point of view to the XO minority stockholders (Ex. P-15A, at B-1).
J.P. Morgan based its financial advice principally upon a DCF analysis which is favored under Delaware law, and which is a commonly used methodology. That analysis used: (a) the un-levered free cash flows that XO was expected to generate on a standalone basis, (b) the tax savings associated with XO's expected NOL usage, and (c) payments that XO expected to receive from Starfire under the TAA, in each case based upon financial projections for the fourth quarter of fiscal year 2011 through fiscal year 2020 (Ex. P-15A, at 15-16).
Based on J.P. Morgan's DCF analysis, the equity value of the common shares was negative $(2.30) to negative $(0.09) per share. (Id.; Ex. P-218, at 13). The 2011 Special Committee also received a comparable companies (or "Public Trading Multiples") analysis, which showed values ranging from negative $(0.35) to positive $0.74 per common share (Ex. P-218, at 13).
The 2011 Special Committee also considered a number of other facts including: (a) that at various times over the preceding three years, independent directors of the Company had considered alternatives for maximizing stockholder value; (b) ACF's affiliates controlled a majority of XO's voting power and had repeatedly made clear that they were buyers not sellers; (c) the unique ability of ACF to utilize XO's NOLs, which positioned them to offer a higher price per share than other potential bidders; and (d) that the benefit to the minority stockholders achievable through a "stay the course" strategy was not reasonably likely to create greater value for the stockholders given XO's prospects, including increased competition as a result of industry consolidation, the challenges faced by XO in successfully executing upon its business plan and meeting its internal projections, and XO's liquidity issues (Ex. P-15A, at 10-11). In view of these factors, the 2011 Special Committee was justified in being concerned that a "stay the course" strategy could have dire consequences.
The 2011 Special Committee also considered that $1.40 per share represented a substantial premium over the Company's historical trading prices - an 84% premium over the ($0.76) closing stock price on January 18, 2011, the last trading day before the public announcement of ACF's offer of $0.70 per share on January 19, 2011, and 65% higher than the highest closing price at which XO common shares has traded in the last three years prior to such announcement, which was $0.85 on April 14, 2011 (Id. at 10). And, as indicated above, the plaintiff offered no evidence that those low stock prices were the result of some deliberate plan or conduct by Icahn (or anyone else). 
For all of these reasons, and the judgment that $1.40 per share represented the highest per-share consideration that could be obtained from ACF and its affiliates, the 2011 Special Committee unanimously resolved that the 2011 Merger was fair to, and in the best interests of, XO and its minority stockholders and determined to recommend the execution of the 2011 Merger Agreement to the XO Board. Id.
At trial, Knauss testified that he believed that, based on its negotiating efforts, the 2011 Special Committee done an excellent job for the shareholders, and noted that J.P. Morgan had told them that "they had a fairness opinion for 1.10 or 1.20 ... [and] couldn't believe [the 2011 Special Committee] succeeded that well." (Tr. 309:12-309:21.)
The record demonstrates that the 2011 Special Committee and ACF engaged in heated, arms-length negotiations, which resulted in the offer price being increased from $0.70 per share to $1.40 per share. Moreover, the price achieved by the 2011 Special Committee was far above the valuation range presented by its independent financial advisor, J.P. Morgan (Ex. P-218 at 13). As a matter of Delaware law, the 2011 Special Committee members had the right to rely on J.P. Morgan's advice (8 Del. C. § 141[e]).
The plaintiffs criticize the negotiating process, asserting that the members of the 2011 Special Committee did not understand the value of the NOLs and lacked the power to say no. The record is to the contrary. The record shows that the 2011 Special Committee received extensive advice about the values of the NOLs, and received express analysis from J.P. Morgan valuing the NOLs (Ex. P-218 at 16), quantifying the discounted cash flows of XO's own NOL usage (Id. at 17), and quantifying the discounted cash flow of the payments likely to be paid by ACF and its affiliates to XO under the existing tax sharing agreement. (Id. at 18). There were also extensive discussions about the value of NOLs to XO, to third-parties and to ACF (see, e.g., Ex. D-4, at 1071 [at Tr. 33:11-14] [Knauss Dep.] ["[I]n both the '09 and '11 transactions we had a significant amount of discussion and advice involving the NOLs."]; Ex. D-4, at 1073 [at Tr. 43] [Knauss Dep.], Ex. D-4, at 1079 [at Tr. 118-19] [Knauss Dep.]; Ex. D-4, at 2897 [at Tr. 176-177] [Bieber Dep.]; Ex. D-4, at 1189 & 1191 [at Tr. 94 & 120] [Zakkour Dep.]. 
The 2011 Special Committee was ultimately able to extract significant value from ACF for the NOLs (Ex. D-4, at 1072 [at Tr. 39:19-21] [Knauss Dep.] ["[B]ased on our negotiations in respect to NOLs, we got better value than I could possibly have imagined."]).
The 2011 Special Committee understood that ACF could not use the NOLs unless it was the owner of 80% of XO and could consolidate its tax returns; that Icahn's company, Starfire, could not use the separate return limitation year ("SRLY") NOL's except as a result of a merger; parties cannot sell NOLs and achieve substantial value; that if ACF acquired the remaining shares of XO, it could utilize XO's SRLY NOLs, which would benefit ACF; and, that the 2011 Special Committee could use this benefit as potential leverage to extract a higher price from ACF (see, e.g., Tr. 259:10-260:1 [Knauss Test.]; Ex. D-4, at 1072 [at Tr. 38-39] [Knauss Dep.]). More was not required.
The plaintiffs' complaints about the 2011 Special Committee striking a deal with Icahn in 2011 due to the "extreme dilution of the minority interests" via the PIK dividends the 2008 Special Committee had agreed to and Icahn's resulting "stranglehold on XO" (see, e.g., Zheng Complaint ¶ 145 & ¶ 190), does not reflect an unfair process. Rather, it is an economic fact resulting from the disappointing performance, and projected poor performance, of XO. XO was not growing fast enough to repay ACF, which had financed the company. In such circumstances, the equity owners are typically not entitled to substantial value. The fact that the 2011 Special Committee was able to extract a price of $1.40 per share in such circumstances is, rather, a testament to their negotiating abilities and proof of a well-functioning, independent committee. 
The plaintiffs cannot claim that the Special Committee was unaware of potential dilution. [*12]Gradin testified that "[d]ilution of minority shareholders vote "was a consideration among many considerations...including the possibility of bankruptcy. And, you know, the stock was trading at 50 cents... and credit markets [were] closed" (Tr. 694: 17-25.). In response to questioning concerning the dilution or other negative effects on the minority resulting from the 2008 Recapitalization, Knauss testified that the ability to pay dividends in kind was something the 2011 Special Committee wanted, as it would spare the company having to spend (much needed) cash, and explained that,

 "It was a very positive effect on the whole company because we took debt off the books and in place of debt we put convertible securities, and that was very positive in the balance sheet. It made it much easier for the whole company, as far as doing markets and other aspects. So if that — yes, it was good for the minority holders because it had the potential of really making XO a viable company, again."

(Tr. 297:8-24 & 264:11-17.)
While the plaintiffs derided the CVR as something "without any value" — because they assumed that ACF would not attempt to sell assets of XO within the following year (e.g., Zheng Complaint, ¶ 196[d]) — their assumption was wrong (as ACF did attempt to sell XO but found no takers, as noted above) and, regardless, the CVR did have value as it protected the minority stockholders against an unexpected event.
The plaintiffs offered no evidence (whether through their expert Keller or otherwise) that Icahn, or any other defendant, interfered with, pressured, intimidated, or otherwise dominated the members of the 2011 Special Committees or their legal and financial advisors, or otherwise engaged in any bad faith conduct. The plaintiffs proffered no evidence that any viable offers were ever made, other than Mr. Icahn's.After the meeting of the XO Board, written consents approving the 2011 Merger were signed by the holders of a majority of shares entitled to vote on the 2011 Merger and were delivered to XO (Ex. P-15A, at 9).
Following this Court's denial of the plaintiffs' motion for a preliminary injunction seeking to enjoin the 2011 Merger, plaintiff R2 filed an appraisal action in Delaware, but then chose to withdraw it and be cashed out at $1.40 per share (see Tr. 236:25-237:11 [Knauss Test.]). 
The plaintiffs assert that the $1.40 Merger price negotiated by the 2011 Special Committee was not fair, and the fact that that price was nearly double the share-price that the stock was publicly trading at when ACF made its January 2011 offer does not reflect a healthy premium because XO's stock's price was deliberately depressed per some scheme by Icahn (see, e.g., Zheng Complaint, at ¶183). However, the plaintiffs failed to prove any such scheme or conduct. 
The only evidence the plaintiffs submitted at trial to support their proposition that the $1.40 price was unfair was the expert testimony of Gokhale, who considers three valuation methodologies and valued the shares of XO at the time of the merger at "$2.89 per share, with a range of $2.28 to $3.51 per share." (Ex.17A at 1 [Gokhale Aff.]).
The defendants, offered at trial the expert opinion of Kane concerning XO's value, which he determined to be zero dollars per share (Ex. D-3, ¶ 14). And, they also offered the testimony of SungHwan Cho ("Cho"), Icahn Enterprises, LP's C.F.O., who, despite the plaintiffs' claims, [*13]also valued XO at substantially less than the $1.40 per share negotiated by the 2011 Special Committee (as noted below).
This Court also had the benefit of the opinion of J.P. Morgan (the 2011 Special Committee's independent financial advisor in 2011) via the testimony of that investment bank's Anwar Zakkour ("Zakkour"). Although called as a witness by the plaintiffs, Zakkour's testimony provided no evidence whatsoever that $1.40 per share was an unfair price. J.P. Morgan's valuation was substantially lower than Gokhale's.
Gokhale valued XO as a standalone company, which value included the value of XO's NOLs to XO, but also purported to assign a value of XO's NOLs to Icahn (see, e.g., Ex. P-17A, ¶ 44). However, the value of XO's NOLs to Icahn is irrelevant because such value in 2011 was entirely speculative (as neither Icahn nor anyone else did or could project future profits of Starfire, Icahn's affiliate), but also under Delaware law post-merger synergies, including NOLs, are not an appropriate component in determining the value of the company to be merged. Moreover, as already noted above concerning the 2008 Recapitalization, the plaintiffs' emphasis on a refusal of Mr. Icahn to provide the 2011 Special Committee with tax returns is irrelevant as obviously such returns reflect only past profits, if any, past taxable income, not future taxable income.
The valuation on behalf of the plaintiffs by Gokhale is around four times XO's January 19, 2011 stock market price, which by itself causes this Court to consider Gokhale's conclusion of value with skepticism, especially because it is unsupported by any evidence whatsoever that J.P. Morgan's independent opinion should not be given more weight than Gokhale's after-the-fact opinion.
This Court concludes that the fair value of the common shares of XO as of July 11, 2011 (the "2011 Valuation Date") was $0.00 per share (see Ex. D-2, ¶ 14 [Kane Aff.] & Kane Report, ¶¶ 1, 12, 178).
Kane relied on the DCF method as the primary valuation technique to estimate the fair value of XO as of the 2011 Valuation Date (see Ex. D-2, ¶¶107-108 [Kane Aff.] & Kane Report at ¶ 121-122).
Kane deemed the projections provided by J.P. Morgan in its presentation to the 2011 Special Committee on July 11, 2011 reasonable, and utilized them in his DCF analysis (see Ex. D-2, ¶121 [Kane Aff.] & Kane Report at ¶ 144).
J.P. Morgan used the "Gordon Growth Model" to calculate the terminal value for XO (Ex. D-2, ¶157 [Kane Aff.] & Kane Rebuttal, ¶86).
The Gordon Growth Model calculation for the terminal value is based on projecting cash flows at a constant long-term growth rate (Ex. D-2, ¶ 157 [Kane Aff.] & Kane Rebuttal, ¶86).
In its terminal value Gordon Growth Model, J.P. Morgan assumed a long-term growth rate of 2.0 percent (Ex. D-2, ¶ 157 [Kane Aff.] & Kane Rebuttal, ¶ 86).
Kane used the Gordon Growth Model to calculate the terminal value for XO. Kane assumed a long-term revenues growth rate of 3.0 percent (see Ex. D-2, ¶ 131 [Kane Aff.] & Kane Report at ¶ 154 and Schedule 7).
The revenue growth rates in the J.P. Morgan projections utilized by Kane were projected to grow in the near term and then decline to 3 percent by 2020 (Ex. D-2, ¶122 [Kane Aff.] & Kane Report at ¶ 145 and Schedule 7).
The estimated long-term (10-year) average growth in the Consumer Price Index as of the 2011 Valuation Date was 2.4 percent (Ex. D-2, ¶ 103 [Kane Aff.]).
Kane estimated the discount rate for XO as of the 2011 Valuation Date to be 11.0 percent (see Ex. D-2, ¶ 118 [Kane Aff.] & Kane Report at ¶ 141 and Schedule 6).
The appropriate pre-tax cost of debt was 8.56 percent as of the 2011 Valuation Date. (Ex. D-2, ¶ 112 [Kane Aff.] & Kane Report at ¶ 128 and Schedule 6).
Assuming a tax rate of 39.3 percent, the appropriate after-tax cost of debt is 5.2 percent as of the 2011 Valuation Date (Ex. D-2, ¶ 112 [Kane Aff.] & Kane Report at ¶ 128 and Schedule 6).
Based on the Capital Asset Pricing Model ("CAPM"), the required return on equity for XO as of the 2011 Valuation Date is approximately 16.2 percent (Ex. D-2, ¶114 [Kane Aff.] & Kane Report at ¶ 136 and Schedule 6).
The appropriate risk-free rate is approximately 4.0 percent (Ex. D-2, ¶ 113-114 [Kane Aff.], referencing Kane Report at ¶ 132 and Schedule 6)).
Based on guideline companies selected, the appropriate unlevered "beta" (or, systematic risk for this type of equity investment) for XO is 0.69 (Ex. D-2, ¶ 113-114 (referencing Kane Report at ¶133 and Schedule 6) & ¶ 130 [Kane Aff.]).
The appropriate "market risk premium" is 5.5 percent, based on the Duff & Phelps LLC market risk premium study as of the 2011 Valuation Date (Ex. D-2, ¶¶ 113-114 [Kane Aff.], referencing Kane Report at ¶134 and Schedule 6), and the appropriate "size premium" (also known as a small stock premium) for XO is 6.36 percent, based on data provided by Ibbotson Associates as of the 2011 Valuation Date. This size premium reflects the 10th decile (Ex. D-2, ¶113-114 [Kane Aff.], referencing Kane Report at ¶ 135 and Schedule 6).
Based on the weighted average coupon rate on the Series B and Series C Preferred Shares, the weighted average return on XO's preferred shares was 7.76 percent (Ex. D-2, ¶ 116 [Kane Aff.] & Kane Report at ¶ 139).
The appropriate capital structure based on the guideline public companies is 47.1% debt and 52.9% common equity (Ex. D-2, ¶117 [Kane Aff.] & Kane Report at ¶ 140).
Based on the findings above, a weighted average cost of capital ("WACC") of 11.0 % is appropriate for XO as of the 2011 Valuation Date (Ex. D-2, ¶ 118 [Kane Aff.] & Kane Report at ¶141).
Discounting the projected cash flows using the discount rate of 11.0%, the fair value was determined to be $490 million (Ex. D-2, ¶ 132 [Kane Aff.] & Kane Report at ¶ 155).
Kane projected the cash flows for the NOLs used by XO in years when it generated taxable income and the NOLs used by Starfire in accordance with the 2008 ATAA until the NOL balance was depleted (see Ex. D-2, ¶134 [Kane Aff.] & Kane Report at ¶ 157).
Applying the discount rate of 11.0%, the fair value of the NOLs is $322 million (Ex. D-2, ¶ 134 [Kane Aff.] & Kane Report at ¶157).
The total value indication of XO as of the 2011 Valuation Date, including its operations and the tax benefit of its substantial NOLs, is approximately $812 million (Ex. D-2, ¶ 136 [Kane Aff.] & Kane Report at ¶159).
Based on the Total Value of XO, there was not enough value to fully satisfy the $980.9 million preferred shares liquidation preference (the amount that must be paid to preferred shares [*14]holders in order to retire outstanding preferred shares) (Ex. D-2, ¶¶ 137, 153 [Kane Aff.] & Kane Report at ¶168-169 and Figure 20).
In order to estimate the fair value of XO's common shares, the liquidation preference of the preferred shares must be subtracted from the calculated Total Value of XO (Ex. D-2, ¶ 145 [Kane Aff.] & Kane Report at ¶ 168 and Figure 20).
The fair value of the Common Equity of XO was negative $168 million. Based on total shares outstanding of 182 million, this implies a value of negative $(0.92) per share (Ex. D-2, ¶ 146 [Kane Aff.] & Kane Report at ¶ 169 and Figure 20).
Because XO has unique characteristics compared to its peer group such as lower margins and growth potential, as well as a concentration of business customers and an asset-based fiber-optic network, the Market Approach, used by Gokhale, is not the best indicator of value for XO. (Ex. D-2, ¶147 [Kane Aff.] & Kane Report at ¶170).
Some of the guideline companies differ in size, profitability, growth potential and industry focus. These factors must be taken into account when applying the range of values to XO (Ex. D-2, ¶148 [Kane Aff.] & Kane Report at ¶ 171).
Since XO had both a lower EBITDA margin and lower historical revenue growth compared to the guideline company peer group, it would be valued at a discount. Therefore, the bottom of the range of multiples, if not lower, would be most appropriate for XO (Ex. D-2, ¶ 149 [Kane Aff.] & Kane Report at ¶ 174).
The value obtained from the income approach is the most reasonable and reliable approach to estimate the value of XO's common shares as of the 2011 Valuation Date (Ex. D-2, ¶ 149 [Kane Aff.] & Kane Report at ¶ 174).
Based on a review of comparable transaction financial metrics and target company industries, along with the factors discussed above that are unique to XO, the Company would be valued at the lowest end of the valuation multiple ranges (Ex. D-2, ¶ 151 [Kane Aff.] & Kane Report at ¶ 176).
This Court concludes that based on this analysis, which it adopts, the value generated from the income approach is most reasonable (Ex. D-2, ¶ 151 [Kane Aff.] & Kane Report at ¶ 176).
The following summarizes Kane's testimony regarding Gokhale's assumptions, methodology, and opinions.
The terminal value methodology used by Gokhale in his 2011 Valuation is different from what J.P. Morgan and Kane used, and is different from what Gokhale himself used in his 2008 Valuation (Ex. D-2, ¶ 131 & ¶¶ 156-159 [Kane Aff.]; Kane Rebuttal, ¶ 86, ¶ 88 & Kane Report at ¶ 154 and Schedule 7).
The J.P. Morgan DCF analysis on which Gokhale relies results in an enterprise value estimate for XO of $372 million (Ex. D-2, ¶ 159 [Kane Aff.]; Ex. P-17A, Appendix C at Ex. 14 ([Gokhale Report]).
The terminal value adjustment Gokhale made to J.P. Morgan's DCF analysis resulted in an enterprise value estimate for XO of $890 million (Ex. D-2, ¶ 159 [Kane Aff.]; Kane Rebuttal, ¶ 88; Ex. P-17A, Appendix C at Ex. 14 [Gokhale Report]).
In order to achieve an enterprise value estimate of $890 million using the Gordon Growth method, a long-term growth rate of 7.26 percent would be required (Ex. D-2, ¶160 [Kane Aff.] [*15]& Kane Rebuttal, ¶ 89).
In his 2011 valuation, Gokhale adjusted the terminal value methodology used by J.P. Morgan by using an EBITDA multiple, rather than the Gordon Growth Model. This adjustment was inconsistent with the terminal value methodology used in Gokhale's own 2008 analysis. The adjustment resulted in a 139% increase in Gokhale's estimated value over that of J.P. Morgan's (Ex. D-2, ¶¶ 156-159 [Kane Aff.]; Kane Rebuttal, ¶86, ¶88; Ex. P-17A, Appendix C at Ex. 14 [Gokhale Report]).
If Gokhale incorporated a size premium into his 2011 discount rate, as he did in his 2008 analysis, the resulting discount rate would have been 14.8%, instead of 10.5% (Ex. D-2, ¶¶ 162-164 [Kane Aff.] & Kane Rebuttal, ¶ 92-93; Gokhale Report at Ex. 14).
Using Gokhale's DCF analysis (Ex. P-17A, Appendix C at Ex. 14 [Gokhale Report]), with two corrections, results in a value per share of $0.00. These two corrections are: (1) correcting the discount rate to 14.8 percent, reflecting the application of a size premium; and (2) using the Gordon Growth Method with a long-term growth rate assumption of 3.0 percent (Ex. D-2, ¶ 178 [Kane Aff.] & Kane Rebuttal, ¶ 108).
Gokhale uses the same companies in his 2011 Comparable Company analysis as he did in his 2008 Comparable Company analysis. Therefore, the same reasons apply regarding the lack of comparability of the companies to XO (Ex. D-2, ¶¶ 165-166 [Kane Aff.] & Kane Rebuttal, ¶ 95). The comparable companies used by Gokhale were not comparable enough to XO to rely on the Market Approach as an indication of value (Ex. D-2, ¶¶ 85-86, ¶¶ 165-166 [Kane Aff.] & Kane Rebuttal, ¶55 and Schedule 1).
Using the market value of debt in the calculation would reduce Gokhale's market multiples (Kane Rebuttal, Schedule 3).
Gokhale stated that the companies in his Comparable Transaction Method satisfied three general criteria: (1) they were subject to merger/acquisition activity, (2) they had a specific "SIC" (standardized industrial classification) code, and (3) Capital IQ reported EV/EBITDA multiples for the transaction (see Ex. D-2, ¶¶ 168-169 [Kane Aff.] & Ex. P-17A, Appendix C at ¶ 49 [Gokhale Report]).
Four of the twelve target companies in Gokhale's Comparable Transaction Method were either less than one tenth the size of XO, or more than ten times the size of XO, based on EBITDA (Ex. D-2 at ¶ 168 [Kane Aff.] & Kane Rebuttal, ¶ 98).
Gokhale included a transaction involving a target company based in Siberia that generates 100 percent of its revenue in Russia (Ex. D-2, ¶ 169 [Kane Aff.] & Kane Rebuttal, ¶ 99).
Gokhale's Comparable Transaction Method includes transactions involving target companies that are not sufficiently comparable to XO to provide a reliable indication of value. Therefore, Gokhale's Comparable Transaction Method was ignored (Ex. D-2, ¶87, ¶168 [Kane Aff.] & Kane Rebuttal, ¶¶ 97, 98).
Gokhale's 2011 Comparable Transactions analysis includes target companies that had NOLs (Ex. D-2, ¶ 170 [Kane Aff.] & Ex. P-17A, Appendix C, at Ex. 16A [Gokhale Report]).
It is reasonable to conclude that the transaction values and resulting valuation multiples incorporate the value of the target company NOLs (Ex. D-2, ¶ 170 [Kane Aff.] & Kane Rebuttal, ¶ 100).
Gokhale takes the resulting enterprise value estimate, based on the Comparable [*16]Transaction Method — which already incorporates the value associated with the target company NOLs — and then adds the value of XO's NOLs to estimate equity value (Ex. D-2, ¶ 170 [Kane Aff.] & Kane Rebuttal, ¶ 100).
By incorporating NOL value in the guideline transaction valuation multiples which are used to estimate enterprise value, and by directly adding the value of XO's NOLs to the enterprise value to estimate equity value, Gokhale is effectively double-counting NOL value (Ex. D-2, ¶ 170 [Kane Aff.] & Kane Rebuttal, ¶ 100).
In his analysis, Gokhale subtracts the liquidation preference of XO's preferred equity to estimate the value of XO's common equity (Ex. D-2, ¶ 171 [Kane Aff.]; Kane Rebuttal, ¶ 101 & Ex. P-17A, Appendix C at Ex. P-17 [Gokhale Report]).
XO's preferred shares (owned by Icahn) included a PIK feature that permitted interest payments to accrue to the liquidation preference of the preferred shares rather than having the interest payments paid in cash (Ex. D-2, ¶¶ 172-173 [Kane Aff.] & Kane Rebuttal, ¶ 102).
XO management indicated that it never paid a cash dividend, and did not intend to do so in the future (Ex. D-2, ¶ 172 [Kane Aff.] & Kane Rebuttal, at ¶102).
Due to the accrual of the PIK interest on the preferred shares, the preferred shares would grow over time, representing an increasing proportion of XO equity ownership over time (Ex. D-2, ¶172 [Kane Aff.] & Kane Rebuttal, ¶102)
By simply subtracting the liquidation preference of the preferred shares, Gokhale failed to account for the PIK feature of the preferred shares (Ex. D-2, ¶¶ 171-172 [Kane Aff.] & Kane Rebuttal, ¶ 102)
The Series B Preferred Shares had a conversion feature, which permitted the holder of the Series B Preferred Shares (Mr. Icahn) to convert into common equity at a conversion price of $1.50 per share (Ex. D-2, ¶173 [Kane Aff.] & Kane Rebuttal, aft ¶103)
Gokhale concluded that the value of XO's common shares was $2.89 per share. At this price, this Court will assume that the holders of the Series B Preferred Shares would have exercised their conversion option (Ex. D-2, ¶ 175 [Kane Aff.] & Kane Rebuttal, ¶ 105).
By subtracting the liquidation preference of the preferred shares, Gokhale fails to account for the conversion feature of the Series B Preferred Shares (Ex. D-2, ¶173, ¶175 [Kane Aff.] & Kane Rebuttal, ¶105).
In July 2011, XO's common shares was trading in the public market at prices significantly lower than Gokhale's estimate of value of $2.89 per share (Ex. D-2, ¶ 177 [Kane Aff.] & Kane Rebuttal, ¶107).
The highest premium paid in a transaction in the telecommunications industry over the 5 years leading up to the July 11, 2011 Valuation Date was between 134 percent and 145 percent. The implied premium based on Gokhale's valuation was over 300 percent (Ex. D-2, ¶ 177 [Kane Aff.] & Kane Rebuttal, ¶ 107).
With regard to the earlier testimony by Cho concerning projections he prepared during 2011, discussed below, Gokhale — who had criticized in his initial report the projections from XO management used by J.P. Morgan — admitted during cross-examination that he did not arrive at a different valuation for XO in his rebuttal report when using Cho's projections than he did in his initial report (see March 3, 2016 Tr. 51:17-20).
In 2015, Verizon initiated discussions with Icahn for the purchase of XO (Tr. 1139:4-9). [*17]Ultimately, in 2016, an agreement was entered into for the purchase of XO's assets for $1.8 billion, other than what was known as the Nextlink segment of the business, which consisted of broadband spectrum, which Verizon agreed to lease.[FN6]
Verizon further received an option to purchase the aforementioned Nextlink assets by year-end 2018 (see Tr. 1143:22-26 & 1156:7-1157:9; Ex. A attached to the Feb. 25, 2016 Affidavit of Judith Spanier submitted in support of plaintiffs' "joint opposition to Defendants' oral motions, made on February 17 and 18, 2016, (I) to strike the October 26, 2105 direct testimony affidavit of plaintiffs' expert, Stan Keller; and (ii) to preclude Mr. Keller from testifying in plaintiffs' rebuttal case" [herein, "Spanier Aff."]).
Significantly, Verizon publicly stated in its press release that of the $1.8 billion purchase price, only $300 million was attributable to the standalone value of the assets purchased, with the remaining $1.5 billion being attributable to post-acquisition synergies for Verizon (see Spanier Aff., Ex. A).
The credible evidence, assuming that the 2011 Merger had not taken place, was negative forty-four cents for the common shareholders, leaving the minority shareholders with no benefit (Tr. 1155:10-25, Ex. D-5).[FN7]
 Had XO received $2 billion, minority shareholders would have received only $0.66 per share (assuming the Series B Preferred shares were not converted) or $1.32 per share (assuming they were converted) (Tr. 1158: 6-16; Ex. D-5).
The price of XO's common shares at the time Icahn made his $0.70 offer on January 19, 2011 was $0.73. Those shares had been trading at under a dollar for approximately three years (as low as $0.12 in late 2008. During the preceding year (2010) the stock was trading for under a dollar, reaching a high of $0.80 on only three days, in late April and early May. Between January 19, 2011 (the time of Icahn's initial offer) and July 11, 2011 (the 2011 Merger was announced), XO shares traded in the range between $0.66 and $0.85 per share, with an average price of $0.73 per share (see Ex. D-3). 
This Court concludes that the $1.40 per share that the plaintiffs and minority shareholders received was fair, because (a) the Court finds that Kane's opinion as to XO's value was more credible than Gokhale's, (b) the 2011 Merger price for this company was approximately double the market price of XO stock, which had consistently traded under a dollar for approximately three years (since April 15, 2008), (c) the only buyer in 2011 who could achieve a potential material benefit from XO's NOLs, and therefore be willing to then pay as much as $1.40 for XO, was Icahn's affiliate, ACF, (d) Kane's opinion was consistent with J.P. Morgan's valuation, and the plaintiffs offered no evidence to question J.P. Morgan's independence, and (e) J.P. Morgan issued a fairness opinion that was approved by an independent committee at J.P. Morgan.
Icahn was able to use certain of XO's SRLY NOLs over the ensuing years. However, [*18]there is no evidence that Icahn knew or could have known the extent he would be able to use part or all of those NOLs any more than he could have known what future use he could make of the non-SRLY NOLs after the 2008 Recapitalization. He did not use any NOLs of XO in 2009 and 2010.
Mr. Icahn's ability to use XO's SRLY NOLs as a result of the 2011 Merger was a post-merger synergy, and the plaintiffs offered no evidence that post-merger synergies are a relevant factor in determining the value of the acquired company.
CONCLUSIONS OF LAW
There is no dispute that Delaware law controls here, and that the individual defendants owed a fiduciary duty to XO, as officers and board members of the company, in connection with both the 2008 Recapitalization and the 2011 Merger.[FN8]
The plaintiffs claim that the defendants breached their fiduciary duties by taking part in self-dealing transactions that do not pass muster under Delaware's "entire fairness" test. 
This Court concludes that both the 2008 Recapitalization and the 2011 Merger were entirely fair, and therefore there was no breach of fiduciary duty on the part of defendants.
This Court has previously ruled in these actions that Delaware law clearly provides that "[w]hen a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants initially having the burden of persuasion." (January 2013 Order, citing Americas Mining Corp. v Theriault, 51 A3d 1213, 1239 [Del 2012]).
This Court also there noted that, "[w]hen entire fairness applies, the defendants may shift the burden of persuasion by...[showing]...that the transaction was approved by a well-functioning committee of independent directors. (Id. [citing 51 A3d, at 1240]).[FN9]
And this Court has also observed that the Special Committees must have "function[ed] in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power [at] an arms-length. (Id.)."
The evidence shows that the 2008 Special Committee — the members of which the Court had earlier found to be independent, and who have been dismissed from the plaintiffs' respective complaints, functioned well and with diligence and persistence, and did so under the guidance of independent financial advisors and legal counsel. 
There was no evidence that Icahn, dictated the terms of any of the transactions, or that the committees did not exercise real bargaining power at arm's-length. The testimony confirmed that the 2008 Special Committee "acted as an effective proxy for arms-length bargaining." (In re Cysive, Inc., Shareholder Litig., 836 A2d 531, 534 [Del 2003]). It entered lengthy and contentious negotiations with Icahn, and did so in an informed manner, with their team of [*19]advisors, and obtained a deal that was fair to the minority shareholders.
The witnesses confirmed that the 2008 Special Committee's negotiations with Icahn and his affiliates were at arm's-length and successful, as they improved on the terms Mr. Icahn proposed.
There was nothing perfunctory, deferential or accommodating about the 2008 Special Committee. It was led by Knauss, a highly-respected, long-time law school dean who previously taught corporate governance while a law professor. The 2008 Special Committee took its responsibilities very seriously, hired respected financial and legal advisors, considered their advice, conferred on multiple occasions, and negotiated vigorously during challenging economic times and concerning a company that was always unprofitable and was teetering on the brink of insolvency. 
This Court's conclusion that the process was fair is bolstered by the notable absence of any evidence from any fact witnesses that Icahn, or any other defendant, interfered at all with the 2008 Special Committee, or engaged in any bad faith conduct. The plaintiffs offered no evidence in support of their theory that the 2008 Special Committee members were Icahn pawns (consistent with this Court's finding in its January 2013 Order).
Delaware law provides that the value of the NOLs to the acquiring shareholder is irrelevant to an entire fairness review, as are any other post-merger benefits accruing to the buyer. Delaware's Chancery Court rejected the notion of considering such a supposed value stating that:

 "The difference between the two experts' approaches is that [plaintiff's expert's] methodology presupposes that it is permissible to value the NOLs based upon a stream of income generated by the merged companies, whereas [the defendant's expert's] approach did not include any elements of value (e.g. post-merger revenue) that would belong to the merged entity after the merger. The issue — which approach is correct — is easily resolved. Under Delaware law, any speculative elements of value that may arise from the expectation or accomplishment of the merger must be excluded from consideration...[The plaintiff's expert's] inclusion of projected post-merger earnings of the merged companies in valuing the NOLs transgresses that principle, whereas [the defendant's expert's] valuation of the NOLs does not. Accordingly, the defendants' valuation of the NOLs, consistent with the valuation approaches of Bear Stearns and [the defendant's expert], is the correct one." Emerald Partners v Berlin, 2003 WL 21003437, *29-31 [Del Ch], affirmed 840 A2d 641 [2003]).

The plaintiffs' sole evidence with regard to the fairness of the 2008 Recapitalization was an opinion from, Keller, a Massachusetts lawyer. However, his affidavit (and accompanying expert report), while purporting to provide an expert opinion, actually provides merely legal opinions and his personal views on what the 2011 Special Committee should or should not have done. He does not, for example, cite any custom or practice of corporate special committees in factually similar situations confronted by the 2011 Special Committee. As such, his testimony was not helpful to the Court or necessary — it merely usurps the Court's province in this bench trial — and is therefore inadmissible (See, e.g. Colon v Rent-A-Center, Inc., 276 AD2d 58, 61, [1st Dept 2000]["Expert opinion as to a legal conclusion is impermissible"]); De Long v Erie Cty., 60 NY2d 296, 307 [1983]) [although expert testimony regarding custom and practice could have properly been elicited, "[a]s a general rule the admissibility of expert testimony on a particular point is addressed to the discretion of the trial court...The guiding principle is that expert opinion [*20]is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror"]; Clark v Iceland S.S. Co., 6 AD2d 260, [1st Dept 1958] ["Generally speaking, opinion evidence of an inference or judgment as to the ultimate fact to be determined by the jury is excluded"]).
Even if Keller were deemed to be qualified as an expert in the processes of special committees and his testimony were admissible, this Court does not find his testimony to be persuasive. As set forth above, it is premised on incorrect assumptions and ignores, inter alia, the dire financial straits XO was in, including an imminent "going concern" qualification and potential bankruptcy, as well as Delaware law which is clear that Icahn had no obligation to refinance the massive debt XO owed to him or to sell his shares to some third-party. 
The 2008 Special Committee did seriously consider alternative transactions to the 2008 Recapitalization, none of which resulted in a bona fide offer. There was no evidence that any institution was willing to refinance XO's debt. Moreover, Delaware law did not obligate Icahn to forgive XO's debts (See Odyssey Partners. L.P. v Fleming Cos., 735 A2d 386, 415 [Del Ch 1999] ["[O]ne who may be both a creditor and a fiduciary [e.g., a director or controlling shareholder] does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights."]). Indeed, where a controlling stockholder owns a majority of a company's debt, it may choose to enforce those obligations, even if that means minority stockholders might be wiped out.[FN10]

The 2008 Recapitalization was approved by a well-functioning committee of independent directors. As a result, the burden of persuasion concerning the entire fairness of that transaction shifted to the plaintiffs. They have failed to carry that burden, and they have failed to prove that the price obtained by the 2008 Special Committee in connection with the 2008 Recapitalization was unfair.
As set forth above, this Court finds that XO received fair consideration. Having received fair consideration, there is no unjust enrichment. As a matter of law, the plaintiffs have not make out a case for unjust enrichment because, in determining whether a transaction passes muster under the "entire fairness" test, the relevant factor as to price is whether XO received fair consideration — any benefits that accrued to Icahn post-Merger are simply not relevant. (See Emerald Partners, supra.)
"To prove unjust enrichment, a party must show that the other party was enriched at his or her expense, and it is against equity and good conscience to permit that person to retain what is sought to be recovered." (Shasho v Kleiner, 138 AD3d 973 [2d Dept 2016]). Here, it cannot be said that Mr. Icahn was enriched at plaintiffs' expense, or that it would be against equity and good conscience to permit him to retain the tax benefits of the NOLs he acquired. Icahn did not benefit from any of XO's NOLs at the plaintiffs' expense, they did not own the NOLs, XO did. [*21]To the extent they are complaining on behalf of XO, such a claim would be a derivative claim that cannot be brought post-Merger. In addition, to the extent the NOLs had a pre-Merger value to XO based on expected/estimated future use, that was already taken into consideration by the 2008 Special Committee and their reliance on their financial advisor, J.P. Morgan. There was no unjust enrichment by Icahn.
The plaintiffs' claims concerning an alleged improper dilution of their equity interest and voting power are also without merit, as the 2008 Recapitalization does not constitute an "overpayment transaction]." (January 2013 Order [citing Gentile v Rossette, 906 A2d 91 [Del 2006]). As set forth above, the plaintiffs offered no evidence of economic dilution, to wit, that the shares held by the minority shareholders were worth less as a result of the 2008 Recapitalization. The 2008 Recapitalization reduced the minority shareholders percentage, but they were already minority shareholders to begin with, and there is no evidence of that they suffered any loss, economic or otherwise — the minority shareholders had no control position either before or after the 2008 Recapitalization, including no ability to elect members of the XO Board (Cf. Agostino v Hicks, 845 A2d 1110, 1124 [Del Ch 2004] [where plaintiffs held only a minority interest before the challenged transaction, "under Paramount, there was no loss of voting power requiring compensation," citing to Paramount Commc'ns Inc. v QVC Network Inc., 637 A2d 234, 43]). The 2008 Recapitalization passes muster under Delaware's "entire fairness" test. As matter of law, the evidence set forth above established that the consideration that the 2008 Special Committee diligently negotiated for the minority holders constitutes more-than fair consideration. 
In re Kenneth Cole Productions, Inc., 122 AD3d 500 (1st Dept 2014), affirmed 27 NY3d 268 [2016], involved a class action arising from an effort by a controlling shareholder to take a New York public company private, in which minority shareholders complained that the $15.25 per-share price agreed to by a special committee — instead of the $15.00 offered, which represented a 17% premium over the prior day's stock price — was unfair to them (see pp. 1 & 3 of the decision/order). Justice Lawrence K. Marks rejected (at p. 6) the shareholder-plaintiff's assertion that the company's board members had breached their fiduciary duties by failing to solicit third-party bids for the company where the complaint itself acknowledges that the controlling shareholder consistently asserted he would reject any such offers and "it is undisputed no such offers were received, despite the publicity surrounding [the controlling shareholder's] attempt to repurchase the stock." Although the appeal to the Court of Appeals involved the issue of the effect of a the merger agreement's majority-of-the-minority provision/condition, and resulted in New York expressly adopting the standard of review announced by Delaware's Supreme Court in Kahn v M & F Worldwide Corp., 88 A3d 635 (Del 2014), Justice Marks' finding that a market check was not required was not disturbed by the Court of Appeals or the Appellate Division. The plaintiffs can offer no reason for this Court to disagree with Justice Marks' analysis and conclusion.[FN11]

Accordingly, the clerk is hereby directed to enter judgments in favor of the defendants dismissing the complaints with prejudice. 
This shall constitute the decision and order of this Court.
Dated: October 28, 2016
___________________
J.S.C.



Footnotes

Footnote 1:Icahn owned "roughly 80%" of the "Series A Preferred Shares" (Zheng Complaint, ¶ 49).

Footnote 2:At the time of the 2008 Recapitalization, the XO Board was comprised of defendants Carl C. Icahn, Carl J. Grivner, Vincent J. Intrieri, Peter Shea, Keith Meister, Knauss, Gradin and Dell ("Dell"). However, Messrs. Icahn, Intrieri, and Meister did not cast a vote in connection with the 2008 Recapitalization, and Mr. Shea was present at the board meeting where the 2008 Recapitalization was approved, but he abstained from voting. See Ex. P-8I.

Footnote 3:Defendants ACF Industries Holding Corp., Arnos Corp., Barberry Corp., and High River Limited Partnership were signatories to a stock purchase agreement entered into in connection with the 2008 Recapitalization.

Footnote 4:3 The errors appear in the low discount rate — resulting from the erroneous low assumed cost of debt and the erroneous small selected size premium (also known as a small stock premium) — the high assumed long-term growth rate, and an incorrect terminal year calculation which fails to correctly harmonize depreciation and capital expenditures. Correcting those errors by: (1) using a 15.25% discount rate, (2) using a 3.5% long-term growth rate, and (3) correcting the terminal year calculation, results in a value of $0.38 per share as of the 2008 Valuation Date, not $2.59 per share (Ex. D-2, ¶96; Kane Rebuttal, ¶6, ¶82). Moreover, Kane also points out that Gokhale ignores that the economic environment during the time of the 2008 Recapitalization made it difficult for XO to obtain financing from outside sources (Ex. D-2, ¶64-66; Kane Rebuttal, ¶14-17).

Footnote 5:4 Nor can Plaintiffs plausibly claim that the preferred shares should have paid cash dividends, rather than PIK dividends. Even with the $780 million 2008 restructuring, in 2011 XO had limited cash, and was projected to have borrowing needs in 2012 that may well have exceeded its ability to fund them (Ex. P-218 at 9.). Thus, had XO been required to pay cash dividends of $50 million per year (hundreds of millions of dollars since 2008), it would have run out of money long before 2011 (Ex. P-222, ¶ 7 [Grivner Aff.]).

Footnote 6:5 Of note is that the spectrum had minimal value in 2011 but had achieved potential value by 2016 due to advances in technology (Tr. 1157:10-22 (Cho Test.).

Footnote 7:6 Unlike Gokhale's analysis, the calculation properly took into account the continued accretion of the PIK dividend feature of the Series B Preferred Shares that were issued to Mr. Icahn's affiliate as part of the 2008 Recapitalization.

Footnote 8:7 Because the Court concludes that there was no breach of fiduciary duty we do not rule on whether the corporate defendants owed a fiduciary duty in connection with that transaction.

Footnote 9:8 A second means of shifting the burden is via an informed vote of a majority of the minority shareholders, which was not sought for the Challenged Transactions, nor was such a vote required where, as here, there was an independent well-functioning Special Committee. 

Footnote 10:See S. Muoio & Co. LLC v Hallmark Entertainment Invs. Co., 2011 WL 863007, at *11 [Del Ch 2011]. When the 2008 Special Committee approached Icahn about extending the terms of the Company's credit facility, which would come due in 2009, Icahn refused (see Ex. P-8D [April 18, 2008 Memo from Robert Knauss re: Report on Financing Alternatives]).

Footnote 11:Justice Marks also noted (at pp. 7-8) that "even assuming that a higher price might have been possible, that does not render the special committee's actions a violation of their fiduciary duties. At most, plaintiffs have alleged that they disagree with the manner in which the special committee pursued negotiations with [the controlling shareholder] and are dissatisfied with the result. However, such dissatisfaction does not suggest that the process was unfair or demonstrate that a duty of trust was violated, and plaintiffs have not alleged any particular facts to support their view."
The Court of Appeals similarly ruled that, "while the complaint contains various allegations suggesting that the special committee could have been more effective in negotiating a higher buyout price, none of those allegations are sufficient to support more than conclusory assertions that the committee failed to meet its duty of care in negotiating a fair price. Significantly, the complaint fails to allege any basis to conclude that the committee had an incentive to accept an inadequate price without meaningful negotiations or that it engaged in any unfair conduct. Additionally, the final price of $15.25 per share was higher than the original offer, was within the range of value determined by the committee's independent financial analysts, was recommended by the committee's independent legal counsel and financial advisors, and was higher than the stock's price prior to Cole's announcement that he intended to take the company private."